```
              UNITED STATES DISTRICT COURT
              MIDDLE DISTRICT OF FLORIDA
                   TAMPA DIVISION

TONY WILLIAMS,

     Plaintiff,

v.                          Case No. 8:22-cv-2330-VMC-CPT

R.T.G. FURNITURE CORP.
and SE INDEPENDENT DELIVERY
SERVICES, INC.,

     Defendants.
_____/
```

<u>ORDER</u>

This matter comes before the Court pursuant to Defendant R.T.G. Furniture Corp.'s Motion for Summary Judgment (Doc. # 50) and SE Independent Delivery Services, Inc.'s Motion for Summary Judgment (Doc. # 51), both filed on October 16, 2023, seeking summary judgment on all claims in this Florida Civil Rights Act ("FCRA") and 42 U.S.C. § 1981 case. Plaintiff Tony Williams responded on November 20, 2023. (Doc. # 54). Defendants replied on December 4, 2023. (Doc. ## 55, 56). For the reasons that follow, the Motions are granted.

I.   **Background**

     A.   **RTG and SEIDS**

     R.T.G. Furniture Corp. ("RTG") is a furniture store chain. (McBride Decl. at ¶ 3). The company owns a distribution

center in Lakeland, Florida. (Id.). At this center, RTG uses logistics and delivery companies to deliver furniture. (Id.). One of these logistics companies is SE Independent Delivery Services, Inc. ("SEIDS"). (Id.; Crossley Decl. at ¶ 3).

RTG and SEIDS are two separate companies. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). They have different reporting structures and management. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). In addition, RTG and SEIDS do not and cannot (1) "hire, fire, discipline, or direct the work of," (2) "pay wages, taxes, or insurance for," or (3) "control the terms and conditions" for each other's employees. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). RTG and SEIDS also maintain their own employment-related policies and procedures. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). "RTG ha[s] no control over the terms and conditions of SEIDS employees, and SEIDS ha[s] no control over the terms and conditions of RTG employees." (McBride Decl. at ¶ 4).

Even so, the companies overlap in some respects. SEIDS operates out of RTG's Lakeland distribution center and other RTG locations, despite also having its own locations. (Doc. # 51-3 at 78:16-79:6); (Crossley Decl. at ¶ 3). Additionally, both SEIDS and RTG utilize Retail Management Services Corporation ("RMSC") for managerial and administrative

services. (McBride Decl. at ¶ 1); (Doc. # 55 at 2).  The
employee handbooks for RTG and SEIDS are also very similar in
form and content. (Doc. # 54-2; Doc. # 54-3).

SEIDS's performance of logistics and delivery services
for RTG has changed in recent years. "Between 2018 and 2019,
the SEIDS loadout department — which was responsible for
loading trucks of ordered RTG furniture for delivery by
independent contractor drivers — was transitioned from SEIDS
to RTG [nationwide]." (McBride Decl. at ¶ 5; Crossley Decl.
at ¶ 5). This transition eliminated the jobs of "the vast
majority of SEIDS employees performing the LoadOut function."
(Crossley Decl. at ¶ 5). Several employees in loadout were
transitioned into other positions within SEIDS. (Id. at ¶ 6).
RTG also offered employment to many of the individuals
impacted by the transition. (McBride Decl. at ¶ 5). These
individuals were free to either "accept or decline as they
wished." (Id. at ¶ 5).

B.   **Williams's Employment with SEIDS**

Williams, who identifies as Black and African American,
began his employment with SEIDS in the 1990s. (Williams Depo.
at 28:23-29:19); (Doc. # 1 at ¶ 15). He was promoted to a
supervisor position in 1997 and later promoted to a manager
position around 2000. (Williams Depo. at 35:4-16, 47:11-16).

3

Over the remainder of Williams's employment, he held manager positions in the loadout, quality, and returns departments. (Id. at 47:17-21, 55:1-7, 59:19-25).

Due to the transition of the SEIDS loadout department to RTG, Williams was transferred to a position in SEIDS's returns department on July 22, 2019. (Crossley Decl. at ¶ 6). Williams later received a salary increase after his annual review. (Id. at ¶ 2 & Ex. C).

Williams testified at his deposition that he was jointly employed by SEIDS and RTG from 1993 to 2020. (Williams Depo. at 271:3-8). He believes everyone who worked at SEIDS was also an employee of RTG. (Id. at 272:8-12). He further testified that, until about 2000, his paychecks said RTG and he had an RTG handbook, as well as that his benefits were previously provided through RTG and he had an RTG email and badge. (Id. at 282:6-8, 282:19-22, 283:12-15, 283:21-284:1, 286:7-21).

However, Williams also testified that, as a SEIDS employee, he could not receive direction from RTG employees and RTG employees would have to ask his boss at SEIDS if they wanted him to do something. (Id. at 102:17-23). He also stated that he could not discipline, hire, decide the pay of, or provide input on the performance of the RTG employees he

worked with. (Id. at 274:12-25). Similarly, Williams noted that his work schedule was assigned by SEIDS employees. (Id. at 285:19-24). In addition, at his deposition, Williams was able to clearly differentiate the SEIDS positions from the RTG positions, and the SEIDS employees from the RTG employees. (Id. at 67:14-16, 122:25-123:2, 154:20-25, 277:13-17).

As Susan McBride, Head of HR for RMSC, explained, "RTG had no control over the terms and conditions of" Williams's employment with SEIDS. (McBride Decl. at ¶¶ 1, 4). RTG states that the company never employed Williams and "also never extended any offers of employment to him as part of the load out function transition." (Id. at ¶ 6).

### C.  **Alleged Discriminatory Incidents**

Due to the transition of the loadout department, SEIDS transferred Angela Cook (Caucasian), a longtime employee, to the Lakeland distribution center. (Doc. # 50-5 at 65:18-66:6, 134:1-12). After the transition, Cook became Williams's supervisor. (Id. at 64:18-65:17). Williams originally responded positively to Cook's transfer; he remembered saying, "That's good. She a good worker, I remember her." (Williams Depo. at 118:25-119:1). However, Williams also stated that he did not originally know that she would become his supervisor. (Id. at 119:1-2).

On August 11, 2020, Williams asked Cook if he could leave early for lunch since it was his birthday. (Id. at 129:9-14, 133:8-13). Cook agreed and allegedly stated "don't come back on BPT time," which she clarified meant "Black People Time," and then proceeded to laugh. (Id. at 129:15-19). According to Williams, only he and Cook were part of this conversation. (Id. at 129:20-23).

In response, Williams told Aubrey Henry, Transportation Manager for SEIDS, what Cook had said. (Id. at 131:25-132:11); (Doc. # 50 at ¶ 12). Henry directed Williams report the comment to HR. (Williams Depo. at 132:11-16). However, Williams never did so. (Id. at 132:17-24).

Williams also stated that he told Travis Houston (Black, African American), a loadout manager for RTG, about the "Black People Time" comment. (Id. at 130:17-18). However, Houston's recollection of the comment differs from that of Williams. Houston testified that Williams told him about the "Black People Time" comment, but that Williams had said that Cook had told Williams and "a couple guys in the breakroom," "what do you think you're on, you think you on black people time or what, what do you guys think you're doing." (Houston Depo. at 185:20-186:3, 328:6-14). Houston did not hear Cook make this comment. (Id. at 186:20-21). According to McBride, RTG never

received any complaint regarding the "BPT" or "Black People Time" comment. (McBride Decl. at ¶ 9).

Williams testified that this comment was not isolated. Specifically, Williams testified that Cook would also use terms like "Black mother. Black A. . . . black lazy . . . [d]umb and stupid," when referring to employees at the Lakeland distribution center. (Williams Depo. at 184:12-24).

Williams also testified about other comments and actions he believes provide evidence of discrimination. He testified that the first incident of discrimination occurred when Mark Razon, an RTG employee, told him that Dave Bennett (Caucasian), Vice President for RMSC, wanted to "change the culture." (Id. at 105:11-17, 128:6-129:5); (Doc. # 51-6 at 46:11-47:14). Williams interpreted the statement as "racist because we all – we was all black managers and we was mostly black workers and Hispanic. So to change the culture, that was a racist statement." (Williams Depo. at 128:21-25). Similarly, Razon later told Williams that Bennett was "going to change the culture of the delivery department." (Id. at 105:3-17).

Further, Williams stated that Brian Beckham, RTG's Operations Manager, and Razon were very rude to him. (Id. at 170:19-172:4); (Doc. # 51 at 8). He also raised concerns about

Cook being placed over him in the corporate hierarchy after her transfer; his loss of job responsibilities; Cook telling him that Jerry Brennan, Senior Director of Operations with SEIDS, told Cook to tell Williams not to speak in a meeting with Bennett; and Joe Tipping, a Vice President with SEIDS, not responding to these issues. (Williams Depo. at 91:5-11, 156:1-157:15, 173:25-178:7, 192:6-12); (Doc. # 50 at 13); (Doc. # 51-6 at 16:4-7). Williams also stated that Razon physically threatened Williams before Razon was terminated, as well as in two additional altercations. (Williams Depo. at 193:1-196:8). Further, he testified that "somebody by the name of Anthony" told him "they want y'all out of here so bad it hurts" and told him to "be careful." (Id. at 150:6-151:1).

D. **The Flower Game**

The Federal Trade Commission ("FTC") has recognized scams such as the "Mandala Game" and "Blessing Circle" as "chain letter-type [] pyramid scheme[s]." Seena Gressin, *This "Game" Is A Chain Letter Scam*, Fed. Trade Comm'n Consumer Advice (May 21, 2020), https://consumer.ftc.gov/consumer-alerts/2020/05/game-chain-letter-scam (last visited January 24, 2024).

The FTC issued a public warning about these scams in May 2020. Id. In these scams, individuals are invited to join a

circle by making a cash contribution to the person who invited them. Id. The recruited individual is usually told that they will receive large returns on their investment. Id. Once the individual makes a payment, they are placed on the board. Id. They move towards the center of the board by recruiting others to join the circle. Id. Once the individual reaches the center, they begin to collect the money from new recruits. Id. These scams depend on recruiting new people, so that money will continue to flow into the game. Id. Once a board runs out of new recruits, no new money is added to the board, and everyone not yet at the center of the board walks away with no financial reward. Id.

In August 2020, the FTC published another consumer warning. Karen Hobbs, *A real or fake savings club?*, Fed. Trade Comm'n Consumer Advice (Aug. 10, 2020), https://consumer.ftc.gov/consumer-alerts/2020/08/real-or-fake-savings-club (last visited January 24, 2024). The warning states that "scammers are imitating a type of informal savings club known as a 'sou sou' or 'susu' to trick people into joining what amounts to an illegal pyramid scheme." Id. A "sou sou" is "a rotating savings club with historic roots in West Africa and the Caribbean. It's a savings arrangement between a small group of trusted people – usually family and

friends – who regularly pay a fixed amount into a common fund and take turns getting paid out." Id. Importantly, "[i]n a sou sou, you don't earn interest, never get out more than you paid in, and there's no reward for recruiting people to join." Id. The FTC cautions that "scammers are pitching fake sou sou savings clubs and opportunities." Id. "These kinds of illegal pyramid schemes are the exact opposite of a sou sou: They promise you'll make more money than you put in and depend on recruiting new people to keep money flowing into the fund." Id.

On August 25, 2020, RTG's HR department "received a complaint from Patrick Jackson, Lifts/Bedding Supervisor at RTG (Black, African American), . . . [that] he was invited to join two flower game boards," one to which he was invited by and paid Williams $500 to join and the other to which he was invited by and paid Houston $1,500 to join. (McBride Decl. at ¶ 10). Jackson stated that Williams and Houston told him that he would receive a return of $12,000 for his investment in 4-6 weeks. (Id.). He also stated that, after a while, he noticed that he was not advancing toward the center of the boards, despite several individuals joining each one. (Id.). As a result, Jackson asked for his money back. (Id.). In response, "[Williams] told him to 'trust the process.'" (Id.).

Eventually, Jackson went to RTG's HR department and filed his complaint against Williams and Houston. (Id.).

On August 27, 2020, Jahnu Rodriguez (Hispanic), VP of Corporate Security for RMSC, began his investigation into Jackson's allegations. (Id. at ¶ 11). He interviewed approximately 25-30 witnesses at the Lakeland distribution center between September 1 and 9, 2020, for his investigation. (Id.).

"As a result of [] Rodriguez's investigation, it was discovered that the flower game had been ongoing at the Lakeland distribution center since March 2020, and at least 25-30 individuals (but likely many more) were approached for 'gifts' ranging from $500 to $3,000." (Id. at ¶ 12). "None of these individuals ever received a payout from their respective investments, despite being promised lucrative returns in 4-6 weeks." (Id.). "Although the investigation discovered that numerous individuals participated in the flower game while at the workplace, only three individuals were identified as those actually soliciting the gifts — [Williams,] Houston, and Anthony Snead, another SEIDS employee." (Id.).

"When [Williams] was interviewed about the flower game, he admitted he was involved and solicited funds, but did not

think he was doing anything wrong because they were 'gifts.'" (Id. at ¶ 13). During his deposition, Williams agreed that to move to the center of the board, participants needed to recruit other people to the flower game. (Williams Depo. at 137:3-25).

"When [] Houston was interviewed about the flower game, he denied any involvement or knowledge of it." (McBride Decl. at ¶ 14). However, Jackson provided screenshots of messages that depicted Houston inviting Jackson to join the flower game for $1,500. (Id.). At his deposition, Houston admitted that he had participated and received money from the flower game. (Houston Depo. at 238:1-3, 239:4-8, 240:5-14, 241:3-18).

"Finally, when [] Snead was interviewed about the flower game, he admitted he was involved, but denied soliciting any funds." (McBride Decl. at ¶ 15). "However, the investigation uncovered that [] Snead sent a video about the flower game to an associate on May 21, 2020, in an effort to get the associate to contribute funds . . . ." (Id.).

According to Susan McBride, the head of HR for RMSC, "RTG never received any complaints from any individual regarding 'lottery pools' or 'sports betting pools' at the Lakeland distribution center, such as being misled to

12

participate by being promised lucrative returns on investment." (Id. at ¶ 1, 18). "If RTG had received such a report, RTG would have investigated, and taken appropriate action if the investigation substantiated the allegations." (Id.). According to Susan Crossley, an employee in SEIDS's Operations department, the same is true of SEIDS. (Crossley Decl. at ¶ 8).

### E.   **Williams's Termination**

RTG shared the findings of Rodriguez's September 2020 investigation into the flower game with SEIDS management. (McBride Decl. at ¶ 16). "As a result of their solicitations for a documented pyramid scheme, on September 10, 2020, all three individuals were terminated for 'gross misconduct' from their respective employment." (Id.). SEIDS made the decision to terminate Williams's employment. (Id.).

According to McBride, "[a]t no point did [Williams] complain to RTG that he was being discriminated or retaliated against, or harassed, based on any protected characteristic." (Id. at ¶ 17).

### F.   **Procedural History**

Williams initiated this action on October 11, 2022, asserting claims for race, color, and national origin discrimination under the FCRA and Section 1981. RTG and SEIDS

filed their answers (Doc. ## 7, 9), and the case proceeded through discovery.

Now, RTG and SEIDS both seek summary judgment on all claims. (Doc. ## 50, 51). Williams has responded (Doc. # 54), and RTG and SEIDS have replied. (Doc. ## 55, 56). The Motions are ripe for review.

## II.  **Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (citing Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993)). A fact is material if it may affect the outcome of the suit under the governing law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). The moving party bears the initial burden of showing

14

the court, by reference to materials on file, that there are
no genuine issues of material fact that should be decided at
trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260
(11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S.
317, 323 (1986)). "When a moving party has discharged its
burden, the non-moving party must then 'go beyond the
pleadings,' and by its own affidavits, or by 'depositions,
answers to interrogatories, and admissions on file,'
designate specific facts showing that there is a genuine issue
for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590,
593-94 (11th Cir. 1995) (quoting Celotex Corp., 477 U.S. at
324).

If there is a conflict between the parties' allegations
or evidence, the non-moving party's evidence is presumed to
be true, and all reasonable inferences must be drawn in the
non-moving party's favor. Shotz v. City of Plantation, 344
F.3d 1161, 1164 (11th Cir. 2003). If a reasonable fact finder
evaluating the evidence could draw more than one inference
from the facts, and if that inference introduces a genuine
issue of material fact, the court should not grant summary
judgment. Samples ex rel. Samples v. City of Atlanta, 846
F.2d 1328, 1330 (11th Cir. 1988). But, if the non-movant's
response consists of nothing "more than a repetition of his

conclusional allegations," summary judgment is not only proper, but required. Morris v. Ross, 663 F.2d 1032, 1034 (11th Cir. 1981).

## III. **Analysis**

In his complaint, Williams asserts claims for race, color, and national origin discrimination under the FCRA and Section 1981 against both SEIDS and RTG.[1] (Doc. # 1).

### A. **No Joint Employment**

As a preliminary matter, there is no genuine dispute of material fact that RTG and SEIDS are not joint employers. Claims under the FCRA and Section 1981 may only be brought by employees against their employers. Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1243 (11th Cir. 1998). Therefore, while the parties agree that Williams was an employee of SEIDS, Williams may only bring his claims against RTG if RTG qualifies as his joint employer. See (Doc. # 1 at

---

[1] In Williams's response, he appears to raise a retaliation claim for the first time. See (Doc. # 54 at 17) (citing caselaw relevant to retaliation claims). Claims not raised in a complaint cannot be raised for the first time in a response to a summary judgment motion. See Iraola & CIA, S.A. v. Kimberly-Clark Corp., 325 F.3d 1274, 1286 (11th Cir. 2003) (affirming a district court's refusal to allow a plaintiff "to raise a new claim" in their response to a motion for summary judgment). Therefore, the Court will not consider this claim.

¶ 5) (alleging that "Defendants acted as and were joint employers of Plaintiff").

"[W]here two entities contract with each other for the performance of some task, and one company retains sufficient control over the terms and conditions of employment of the other company's employees, we may treat the entities as 'joint employers' and aggregate them." Lyes v. City of Riviera Beach, 166 F.3d 1332, 1341 (11th Cir. 1999). "Courts predominantly apply the standards promulgated by the National Labor Relations Board when deciding whether two entities should be treated as a joint employer." Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1359 n.6 (11th Cir. 1994) (citing McKenzie v. Davenport-Harris Funeral Home, 834 F.2d 930, 933 (11th Cir. 1987)).

> The basis of the finding [of a joint employer situation] is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer. Thus, the joint employer concept recognizes that the business entities involved are in fact separate but that they share or co-determine those matters governing the essential terms and conditions of employment.

Id. at 1360 (quoting N.L.R.B. v. Browning-Ferris Indus. of Pa., Inc., 691 F.2d 1117, 1123 (3d Cir. 1982)).

"Thus, the ultimate focus of the joint employer inquiry is the degree of control one company exercises over the employees of another company." Kingsley v. Tellworks Commc'ns, LLC, No. 1:15-CV-4419-TWT-JSA, 2017 WL 2624555, at *17 (N.D. Ga. May 24, 2017), report and recommendation adopted, No. 1:15-CV-4419-TWT, 2017 WL 2619226 (N.D. Ga. June 15, 2017). "Whether [one company] retained sufficient control is essentially a factual question." Virgo, 30 F.3d at 1360.

Here, Williams provides some information indicating that RTG and SEIDS are joint employers. He testified that he was jointly employed by the companies between 1993 and 2020, and that he believed that all SEIDS employees were also employed by RTG. (Williams Depo. at 271:3-8, 272:8-12). He further testified that, until about 2000, his paychecks said RTG and he had an RTG handbook, as well as that his benefits were previously provided through RTG and he had an RTG email and badge. (Id. at 282:6-8, 289:19-22, 283:12-15, 283:21-284:1, 286:7-21). Additionally, Williams emphasizes that both RTG and SEIDS used the same Lakeland distribution center, in a workflow involving employees from both companies. (Doc. # 54 at 18). The companies also both used RMSC as a HR provider. (McBride Decl. at ¶ 1); (Doc. # 55 at 2).

18

However, even when viewed in the light most favorable to Williams, this information does not create a genuine dispute of material fact that RTG and SEIDS are joint employers. The evidence shows that RTG and SEIDS do not and cannot (1) "hire, fire, discipline, or direct the work of," (2) "pay wages, taxes, or insurance for," or (3) "control [any] terms and conditions" for each other's employees. (McBride Decl. at ¶ 4; Crossley Decl. at ¶ 4). As McBride explained, "RTG had no control over the terms and conditions of" Williams's employment with SEIDS. (McBride Decl. at ¶ 4). In short, despite some contrary indications from dated paperwork, RTG and SEIDS do not exercise sufficient control over each other's employees to qualify as joint employers. See Wigfall v. Saint Leo Univ., Inc., No. 8:10-cv-2232-SCB-TGW, 2012 WL 717868, at *6 (M.D. Fla. Mar. 6, 2012) (determining that a company was not a joint employer because it "did not control the hiring and firing of the [other company's] food service workers, did not pay them, and did not direct, supervise, or discipline them"), aff'd sub nom. Wigfall v. St. Leo Univ., Inc., 517 F. App'x 910 (11th Cir. 2013).

Williams's testimony that he was unable to receive direction from RTG employees or discipline, hire, decide pay for, or comment on the performance of RTG employees, as well

as his ability to distinguish between SEIDS and RTG employees, provide further evidence that RTG and SEIDS were not his joint employers. (Williams Depo. at 67:14-16, 102:17-23, 122:25-123:2, 154:20-25, 274:12-25, 277:13-17).

That RTG and SEIDS both used the Lakeland warehouse for furniture delivery, used the same HR provider, and maintained similar handbooks, (Crossley Decl. at ¶ 3); (McBride Decl. at ¶ 1); (Doc. ## 54-2, 54-3); (Doc. # 55 at 2), does not negate this evidence.

Since RTG was not Williams's employer, RTG cannot be held liable for harm to Williams under the FCRA or Section 1981. See Llampallas, 163 F.3d at 1243 (determining that claims under the FCRA and Section 1981 may only be brought by employees against their employers). Therefore, RTG's motion for summary judgment on all counts is granted in full.[2]

Additionally, because RTG and SEIDS are not joint employers, each company's actions cannot be attributed as the

---

[2] Even if RTG and SEIDS were joint employers and the conduct of each company's employees could be attributed to the other company, Williams's discrimination claims against RTG under the FCRA and Section 1981 would still fail. No reasonable jury could determine that Williams's termination from SEIDS resulted from discrimination, given the evidence that SEIDS terminated Williams for participating in and soliciting funds for the flower game, which Rodriguez's investigation had determined was a pyramid scheme. (Crossley Decl. at ¶ 7).

actions of the other. Rather, as Williams was only ever employed by SEIDS, the Court will only consider SEIDS's actions during Williams's employment. Thus, comments and actions by RTG employees will not be used to support Williams's claims against SEIDS.

**B.   <u>SEIDS's Motion</u>**

In Williams's complaint, he asserts claims for race, color, and national origin discrimination under the FCRA and Section 1981 (Counts I-VI). (Doc. # 1).

The Court will discuss the FCRA and Section 1981 claims together. <u>See</u> <u>Chapter 7 Tr. v. Gate Gourmet, Inc.</u>, 683 F.3d 1249, 1256-57 (11th Cir. 2012) (explaining that Title VII and Section 1981 discrimination claims have the same requirements of proof and use the same analytical framework); <u>Arnold v.</u> <u>Heartland Dental, LLC</u>, 101 F. Supp. 3d 1220, 1224 (M.D. Fla. 2015) ("When considering claims brought under the FCRA, Florida courts look to decisions interpreting Title VII . . . for guidance.").

**1.   Discrimination Claims**

To prevail on his discrimination claims, Williams must demonstrate that "it is more likely than not," based on either direct or circumstantial evidence, "that [his] termination was based on an illegal discriminatory criterion." <u>Jones v.</u>

Bessemer Carraway Med. Ctr., 151 F.3d 1321, 1323 (11th Cir. 1998).

Williams asserts that he has both direct and circumstantial evidence for his claims. However, neither form of evidence is sufficient to preclude granting SEIDS summary judgment on these claims.

### (a)   Direct Evidence

"Direct evidence of discrimination is evidence that reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee, and, if believed, proves the existence of a fact *without inference or presumption*." Ossmann v. Meredith Corp., 82 F.4th 1007, 1015 (11th Cir. 2023) (citation omitted). "This is a 'rigorous standard.'" Id. (citation omitted). "[C]ourts have found only the most blatant remarks, whose intent could be nothing other than to discriminate on the basis of [a protected characteristic], to constitute direct evidence of discrimination." Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989). "To constitute direct evidence, a statement must '(1) be made by a decisionmaker; (2) specifically relate to the challenged employment decision; and (3) reveal blatant discriminatory animus.'" Castro v. Sch. Bd. of Manatee Cnty., 903 F. Supp. 2d 1290, 1299 (M.D. Fla. 2012) (quoting Chambers

22

v. Walt Disney World Co., 132 F. Supp. 2d 1356, 1364 (M.D.
Fla. 2001)).

Here, none of the statements upon which Williams relies
(Doc. # 54 at 6-8) qualify as direct evidence of
discrimination.

First, Williams asserts that the several statements by
Cook constitute direct evidence: (1) her comment about
returning on "Black People Time" and (2) her references to
Black employees as "Black 'mother f****r,' 'Black A*****e',
'lazy,' 'dumb,' and 'stupid.'" (Doc. # 54 at 7-8); (Williams
Depo. at 184:12-24). These statements are offensive. However,
they do not qualify as direct evidence that Williams's
termination was motivated by discrimination.

"A biased statement, separate in time from the
employment decision under challenge, is not direct evidence
of discrimination." Williamson v. Adventist Health
Sys./Sunbelt, Inc., 372 F. App'x 936, 940 (11th Cir. 2010).
While Williams does not provide a specific timeframe for most
of Cook's comments, he highlights that her "Black People Time"
comment was made only "a few days" before he was called to
discuss the flower game. (Doc. # 54 at 9). However, even
assuming that these comments were made sufficiently close to
Williams's termination, they do not constitute direct

evidence. Cook was not involved in the flower game investigation, see (McBride Decl. at ¶ 2 & Ex. A) (describing the investigation and its findings), and even Williams does not believe she was involved in his termination, see (Williams Depo. at 154:9-12) (stating that the termination "had to be [by] Dave Bennett"). Further, Cook's statements are not clearly connected to Williams's termination. Compare Earley v. Champion Int'l Corp., 907 F.2d 1077, 1081 (11th Cir. 1990) (stating that "[o]ne example of direct evidence would be a management memorandum saying, 'Fire Earley — he is too old'").

Second, Williams asserts that Bennett's comments about changing the culture of the warehouse and delivery department constitute direct evidence. (Doc. # 54 at 8). Williams testified that Razon told him that Bennett wanted to "change the culture." (Williams Depo. at 128:6-129:5); (Doc. # 51-6 at 46:11-47:14). Williams interpreted the statement as "racist because we all – we was all black managers and we was mostly black workers and Hispanic. So to change the culture, that was a racist statement." (Williams Depo. at 128:21-25). Additionally, Razon later told Williams that Bennett was "going to change the culture of the delivery department." (Id. at 105:7-17).

24

However, neither of these comments constitutes direct evidence. These comments do involve Bennett, who may have made the decision to terminate Williams. (Id. at 154:9-12). However, neither statement was explicitly discriminatory in nature. See Ossmann, 82 F.4th at 1015 (defining "[d]irect evidence of discrimination" as "prov[ing] existence of a fact *without inference or presumption*"). "[O]nly the most blatant remarks" qualify as direct evidence. Carter, 870 F.2d at 582. These comments do not meet this standard. Additionally, Williams has not provided evidence that the comments were tied to his termination. Therefore, the Court would need to make inferences to interpret these comments as evidence supporting Williams's discrimination claims. As such, these comments do not qualify as direct evidence.

Third, Williams highlights that after Razon informed Williams of Bennett's comments about changing the culture, Razon physically threatened Williams. (Doc. # 54 at 8). However, as Razon was an employee of RTG, (Williams Depo. at 105:7-17), his actions cannot be attributed to SEIDS.

In sum, no direct evidence of discrimination exists.[3] Thus, Williams has not established a prima facie case based on direct evidence.

**(b)  Circumstantial Evidence**

In Williams's response, he also argues that he has established a convincing mosaic of discrimination. (Doc. # 54 at 11-14). He does not address the framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). (Id.). Thus, the Court need only address whether a convincing mosaic of discrimination exists.

"Aside from the McDonnell Douglas framework, an employee can still survive summary judgment by presenting 'circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent.'" Jenkins v. Nell, 26 F.4th 1243, 1250 (11th Cir. 2022) (quoting Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011)). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id.

---

[3] Williams alleges additional instances of discrimination. However, he does not suggest that they are direct evidence of discrimination (Doc. # 54 at 6-8), and the Court determines that none qualify.

(citation omitted). "A plaintiff may establish a convincing mosaic by pointing to evidence that demonstrates, among other things, (1) suspicious timing, ambiguous statements, or other information from which discriminatory intent may be inferred, (2) 'systematically better treatment of similarly situated employees,' and (3) pretext." Id. (citation omitted).

Williams has not shown a convincing mosaic of discrimination based on race, color, or national origin by SEIDS.

As an initial point, Beckham and Razon were RTG employees. (Williams Depo. at 105:7-17, 170:19-172:4); (Doc. # 51 at 8). Therefore, their comments and actions towards Williams cannot be attributed to SEIDS. Additionally, the other comments and actions that Williams highlights do not suffice to show a convincing mosaic of discriminatory evidence. These incidences include (1) Cook's "Black People Time" comment and other offensive language, (2) Bennett's comments about changing the culture in the warehouse and delivery department, (3) Cook's placement over Williams in the corporate hierarchy, (4) Williams's loss of job responsibilities, (5) his instructions to keep quiet at a meeting, and (5) the lack of response from Tipping. (Id. at 91:5-11, 105:7-17, 128:6-129:5, 129:15-19, 131:25-132:11,

156:1-157:15, 173:25-178:7, 184: 12-24; 192:6-12). Some of this evidence is offensive and discriminatory, such as Cook's language. However, much is race-neutral in nature.

Even if the Court believed these comments sufficiently supported Williams's claims, Williams still could not establish a convincing mosaic of discrimination. Williams has not shown that the reason provided for his termination, his participation in and solicitation of funds for the flower game, was pretextual.

The Eleventh Circuit has "repeatedly emphasized that '[p]rovided . . . the proffered reason [for an adverse employment action] is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it.'" Gogel v. Kia Motors Mfg. of Ga., Inc., 967 F.3d 1121, 1136 (11th Cir. 2020) (quoting Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000)); see also Worley v. City of Lilburn, 408 F. App'x 248, 251 (11th Cir. 2011) ("A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination."). "Thus, to establish pretext at the summary judgment stage, a plaintiff must demonstrate 'such weaknesses, implausibilities, inconsistencies,

28

incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" <u>Gogel</u>, 967 F.3d at 1136 (citation omitted). "[A] reason is not pretext for discrimination 'unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.'" <u>Springer v. Convergys Customer Mgmt. Grp. Inc.</u>, 509 F.3d 1344, 1349 (11th Cir. 2007) (citation omitted). The Court cannot second guess the defendant's business judgment or inquire as to whether its decision was "prudent or fair." <u>Damon v. Fleming Supermarkets of Fla., Inc.</u>, 196 F.3d 1354, 1361 (11th Cir. 1999).

Here, SEIDS states that the company terminated Williams because he participated in and solicited money for the flower game. (Crossley Decl. at ¶ 7). Further, Williams admits he participated in the flower game and received money from it. (McBride Decl. at ¶ 13 & Ex. A).

Williams's argument that Rodriguez's report mischaracterized the flower game as a pyramid scheme instead of as a legitimate "sou sou" savings club favored by Black and African American people is unpersuasive. (Doc. # 54 at 3-4). The flower game was not a legitimate "sou sou" because many participants never got their money back. (McBride Decl.

at ¶ 12). This failure to return the money "invested" motivated Jackson to complain about the flower game and Williams's involvement in it to RTG's HR. (Id. at ¶ 10). Rather, the flower game provided a false promise of large financial reward. (Id. at ¶¶ 10, 12); see also Karen Hobbs, *A real or fake savings club?*, Fed. Trade Comm'n Consumer Advice (Aug. 10, 2020), https://consumer.ftc.gov/consumer-alerts/2020/08/real-or-fake-savings-club (last visited January 24, 2024) ("These kinds of illegal pyramid schemes . . . promise you'll make more money than you put in and depend on recruiting new people to keep money flowing into the fund."). Thus, SEIDS correctly concluded that Williams had solicited money from employees for a pyramid scheme.

Williams further argues that "[h]ad [the flower game] been a lottery pool, a sports betting club, or one of the many other forms of 'gambling' that take place in predominantly white workplaces across America, [RMSC's] investigation would have likely arrived at a different conclusion." (Doc. # 54 at 4). However, "SEIDS never received any complaints from any individual regarding 'lottery pools' or 'sports betting pools' at the Lakeland distribution center." (Crossley Decl. at ¶ 8).

Williams's argument that the RMSC report mischaracterized the flower game also does not shed light on whether SEIDS genuinely relied on this characterization when deciding to terminate Williams. "A legitimate nondiscriminatory reason proffered by the employer is not a pretext for prohibited conduct unless it is shown that the reason was false and that the real reason was impermissible retaliation or discrimination." Worley, 408 F. App'x at 251.

Here, there is no evidence that SEIDS did not believe in good faith that the flower game was a pyramid scheme. "The relevant inquiry is [] whether the employer in good faith believed that the employee had engaged in the conduct that led the employer to discipline the employee." Gogel, 967 F.3d at 1148. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." Alvarez v. Royal Atl. Devs., Inc., 610 F.3d 1253, 1266 (11th Cir. 2010).

RTG directed Rodriguez to investigate the flower game. (McBride Decl. at ¶ 11 & Ex. A). In doing so, Rodriguez interviewed 25-30 people and reviewed written evidence. (Id.). As a result, he determined that the game was an illegal pyramid scheme. (Id. at ¶ 16 & Ex. A). All three RTG and SEIDS

employees found to have solicited money for the flower game were terminated based on their participation in the flower game. (Id. at ¶ 16). There is no reason to doubt that SEIDS relied in good faith on Rodriguez's investigation in deciding to terminate Williams.

"Under but-for causation statutes, like [Section] 1981, [courts] ask whether the discriminatory conduct had a 'determinative influence' on the injury." Ziyadat v. Diamondrock Hosp. Co., 3 F.4th 1291, 1297-98 (11th Cir. 2021). While Williams has provided some evidence that he experienced discriminatory behavior while employed by SEIDS, he has not created a genuine dispute of material fact that his termination was caused by discrimination.

### 2.  Hostile Work Environment Claims

In Williams's response, he argues that he was subject to a hostile work environment. See (Doc. # 54 at 8-10) (arguing that "Plaintiff has adduced evidence of a hostile work environment"). In both RTG's and SEIDS's replies, Defendants argue that these claims were not properly pled in the complaint and, therefore, should not be considered by the Court. (Doc. # 55 at 1-2); (Doc. # 56 at 1-2).

Williams's complaint alleged race, color, and national origin discrimination under the FCRA and Section 1981. (Doc.

# 1). The complaint does not list hostile work environment as a separate count, nor explicitly mention hostile work environment or harassment within any count. At most, the facts section of the complaint includes one reference to Williams being subject to "harassment" by Ms. Cook and the FCRA counts state that he was subject to race-, color-, and national origin-based animosity. (Doc. # 1 at ¶¶ 33, 43, 54, 65).

Courts have previously refused to consider a hostile work environment claim where the plaintiff did not separately plead it. In Palmer v. Albertson's LLC, 418 F. App'x 885 (11th Cir. 2011), the Eleventh Circuit upheld a district court's decision not to consider a plaintiff's hostile work environment claim, stating:

> Where a plaintiff has alleged a host of claims based on discrete facts of discrimination in just one count, we have noted that the plaintiff failed to comply with [Federal] Rules [of Civil Procedure] 8 and 10.
>
> The district court did not err in declining to consider Palmer's hostile work environment claim. In his complaint, Palmer included only two counts: "COUNT I DISABILITY DISCRIMINATION" and "COUNT II RETALIATION." Even if those two counts contained sufficient factual allegations on which to base a plausible hostile work environment claim, . . . Palmer did not articulate that he was making that claim. He should have asserted such a claim and done so in a separate count "so that [Albertson's could] discern what he is claiming and frame a responsive pleading." . . . In any event, even accepting all of his factual allegations as true,

> Palmer has failed to state a hostile work
> environment or harassment claim under the ADA.
> Palmer's use of the words "harassed" in his
> statement of facts and "hostile" in his disability
> discrimination claim neither stated a plausible
> claim for relief nor provided Albertson's with
> sufficient notice to defend against a harassment or
> hostile work environment claim. His attempt to
> raise such a claim in response to Albertson's
> motion for summary judgment came too late.

Id. at 889-90 (citations omitted); see also Hogancamp v. Cnty.
of Volusia, No. 6:18-cv-600-RBD-GJK, 2019 WL 11288567, at *12
n.29 (M.D. Fla. Apr. 1, 2019) (refusing to consider
allegations that Plaintiff was subjected to a hostile work
environment because Plaintiff did not include "a separate
claim for a hostile work environment"); Brantley v. CSX
Transp., Inc., No. 3:23-cv-1127-MMH-MCR, 2023 WL 6392690, at
*1 (M.D. Fla. Oct. 2, 2023) ("If Plaintiff intends to assert
retaliation or hostile work environment claims, he must set
forth those claims in separate counts and identify the
specific factual allegations on which each claim is based.").

Therefore, the Court agrees with RTG and SEIDS that
hostile work environment was not sufficiently pled in
Williams's complaint. Even so, the Court notes that, had
Williams sufficiently pled hostile work environment, the
claims would not have survived summary judgment.

"To establish a hostile work environment claim under [] 42 U.S.C. § 1981, an employee (or former employee) must show harassing behavior 'sufficiently severe or pervasive to alter the conditions of [his or her] employment.'" Bryant v. Jones, 575 F.3d 1281, 1296 (11th Cir. 2009) (citation omitted). The Eleventh Circuit has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim must show:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).

"The fourth element requires a plaintiff to prove that the work environment is both subjectively and objectively hostile." Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1249 (11th Cir. 2014). "To evaluate whether a work environment is objectively hostile, [courts] consider four factors: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or

humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. at 1250-51 (citations and internal quotation marks omitted). "'No single factor is required' to establish the objective component. Instead, the court is to judge the totality of the circumstances." Nelson v. Keep Smiling Dental, P.A., No. 8:21-cv-189-VMC-JSS, 2022 WL 485244, at *7 (M.D. Fla. Feb. 17, 2022) (citation omitted).

In support of Williams's hostile work environment claims, Williams highlights: (1) Cook's "Black People Time" comment, (2) Cook's references to employees at the Lakeland distribution center as "Black mother. Black A. . . . black lazy . . . [d]umb and stupid," (3) Bennett's statement about changing the warehouse culture, relayed to Williams by Razon, (4) Bennett's statement about changing the culture in the delivery department, also relayed to Williams by Razon, and (5) Razon's physical threats to Williams. (Williams Depo. at 184:12-24); (Doc. # 54 at 9-10).

As noted above, the Court will not attribute Razon's actions to SEIDS, as he was an RTG employee. (Id. at 105:7-17). The remaining comments do not establish that a hostile work environment existed.

Again, Bennett's comments about changing the culture of the warehouse and the delivery department were not stated directly to Williams and are not race-based in nature. Therefore, they cannot independently establish that Williams was subject to a hostile work environment.

Cook's "Black People Time" comment and other comments about Black employees are offensive racial comments. However, even considered in conjunction with Bennett's comments, they are not as severe or pervasive as conduct that has survived summary judgment in other courts. See, e.g., Hedgeman v. Austal, U.S.A., L.L.C., 866 F. Supp. 2d 1351, 1364 (holding that hostile work environment claim based on racial harassment survived summary judgment where Caucasian co-workers and supervisors referred to African Americans by racial slurs "on an almost daily basis during [plaintiff's] employment," plaintiff "regularly encountered racial graffiti" in the workplace bathrooms, and "images of the Confederate flag . . . permeated the workplace as regularly displayed and/or worn on Caucasian co-workers' t-shirts"); Nelson, 2022 WL 485244, at *6 (hostile work environment claim survived summary judgment where plaintiff's supervisor called plaintiff a "'stupid black bitch' on more than five occasions and 'possibly' on more than 10 occasions over a two-year

period," "taunted [plaintiff] about being late, saying that was the 'colored people time that they talk about,'" and "made comments about [plaintiff's] eating habits, telling [plaintiff] 'You better stop eating that n----- food. You're going to get too fat'"). Additionally, while the "Black People Time" comment was directed at Williams (Williams Depo. at 129:15-19), the other comments were made to him primarily in reference to other employees. See (Id. at 186:21-187:5) ("[S]he said it in front of me because I guess she wanted me to hear her talk that way, but she couldn't talk to me that way because I'm professional. . . . [S]he talked to me like that when she first got there and I let her know, I'm not going to be talked to like that.").

Therefore, had Williams properly pled hostile work environment claims, RTG and SEIDS would still have been granted summary judgment.

Summary judgment is granted to SEIDS on Counts I-VI.

Accordingly, it is now

**ORDERED, ADJUDGED,** and **DECREED:**

(1) Defendant R.T.G. Furniture Corp.'s Motion for Summary Judgment (Doc. # 50) is **GRANTED.**

(2) Defendant SE Independent Delivery Services, Inc.'s Motion for Summary Judgment (Doc. # 51) is **GRANTED.**

38

(3)   The Clerk is directed to enter judgment in favor of Defendants R.T.G. Furniture Corp. and SE Independent Delivery Services, Inc. and against Plaintiff Tony Williams on all counts of the complaint.

(4)   Thereafter, the Clerk is directed to terminate all pending deadlines and **CLOSE** the case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida, this 29th day of January, 2024.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE